# IN THE SUPREME COURT OF CALIFORNIA

EUGENE G. PLANTIER, as Trustee, etc., et al.,
Plaintiffs and Appellants,

v.

RAMONA MUNICIPAL WATER DISTRICT,
Defendant and Respondent.

S243360

Fourth Appellate District, Division One
D069798

San Diego County Superior Court
37-2014-00083195-CU-BT-CTL

May 30, 2019

Justice Corrigan authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Liu, Cuéllar, Kruger, and Groban concurred.

PLANTIER v. RAMONA MUNICIPAL WATER DISTRICT

S243360

Opinion of the Court by Corrigan, J.

Before a local governmental agency may impose or increase certain property-related fees and charges, it must notify affected property owners and hold a public hearing. The hearing requirement arises from article XIII D, section 6 of the California Constitution,[1] which was added in 1996 by Proposition 218.[2] The question here is a narrow one. When an agency considers increasing a property-related fee, must a fee payor challenging the *method* of fee allocation first exhaust "administrative remedies" by participating in a Proposition 218 hearing that addresses only a proposed *rate* increase? The answer is no. Even if a Proposition 218 hearing could be considered an administrative remedy, it would not provide an adequate remedy for a challenge to the method used to allocate the fee burden in this case.

## I. BACKGROUND

The representative plaintiffs in this class action are commercial property owners seeking to invalidate a wastewater service charge imposed by the Ramona Municipal Water District

---

[1] Unspecified references to "article" refer to articles of the California Constitution.

[2] The terms "fee" and "charge" as used in Proposition 218 are synonymous (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 214, fn. 4) and are used interchangeably throughout this opinion.

(the District). They claim the District's *method* for calculating the charge violates one of the substantive requirements of Proposition 218. The District contends the suit is barred because the plaintiffs failed to exhaust administrative remedies by raising their challenge at public hearings on proposed increases to the *rate* charged for services. The trial court agreed with the District but the Court of Appeal reversed and allowed the action to proceed.

A. *The District's Wastewater Service Charge*

The District provides water and wastewater (sewer) services to businesses and residents in an unincorporated area of San Diego County. It operates two wastewater treatment plants that together serve at least 6,891 parcels.

The District is organized under the Municipal Water District Law of 1911 (Wat. Code, § 71000 et seq.) and is authorized to set, revise, and collect charges for services. (Wat. Code, § 71670.) Under the District's legislative code, sewer charges are based on an "Equivalent Dwelling Unit" (EDU) method. An EDU is a measure that equates to 200 gallons of daily sewage. The EDU assignment method is used to allocate fees proportionally to different parcels that require greater or lesser services. Most single-family homes are assigned one EDU, as is each dwelling unit in a condominium or townhouse. Commercial parcels are assigned EDUs by a schedule containing over 20 categories of commercial properties, like restaurants, hotels, and office buildings. The EDU for commercial parcels is based upon factors that differ depending upon the parcel's use. These factors include the square footage of a restaurant or office building, the number of beds in a hospital, and the number of guest rooms in a hotel.

A parcel's annual sewer charge is calculated by multiplying the parcel's assigned EDUs by a "per-EDU" rate.[3] Thus, the charge consists of two components: the number of assigned EDUs and the applicable per-EDU rate. The sewer charge typically appears on a parcel's property tax bill. The EDU assignment method treats properties individually based on each parcel's use. It is different from the rate, which is the same for all fee payors served by a particular treatment plant. Some fee payors will have a larger sewer charge than others. This discrepancy is driven by the EDU assignment method, not by imposition of different rates.

The District reviews its operations and maintenance costs annually. After review in 2012, 2013, and 2014, the District sought to increase its rates to cover costs. To comply with Proposition 218, the District mailed out notices and held what it describes as "Proposition 218 hearings."

In each of those years, property owners were notified of an intended rate increase. The proposed changes involved only the *rate* and not the *method* of assigning EDUs to parcels. The 2012 and 2013 notices made no mention of the EDU assignment method. The 2014 notice included a brief paragraph explaining the EDU system but gave no indication the District was considering any change in how EDUs are assigned.

All notices stated that "[a]ny property owner or any tenant directly responsible for the payment of" sewer fees could submit a written protest to the "proposed increases in the rates and fees . . . ." The District informed property owners that its board

---

[3] A different rate is used for each of the District's two treatment plants.

of directors would "hear and consider" all written and oral protests "to the proposed *rate* increases" at the scheduled public hearing.  (Italics added.)  Property owners were told that the District would be authorized to impose the proposed rates unless it received protests from a majority of affected fee payors.

The District received fewer than 15 written protests to proposed rate increases in 2012, 2013, and 2014.  None of the written protests challenged the EDU system for calculating a parcel's sewer charge (number of assigned EDUs x per-EDU rate) or the method of allocating EDUs.  The District adopted the proposed rate increases at the close of each public hearing.

B.    *Plantier's Objection to the EDU Assignment Method*

Since 1998, Eugene Plantier has owned a restaurant served by the District.[4]  In early 2012, the District concluded the restaurant released significant amounts of grease into the sewer system.  It also learned it had assigned only 2.0 EDUs to the parcel instead of the 6.82 EDUs it deemed were more appropriate based upon the property's size and use.  In June 2012, the District notified Plantier that the EDUs assigned to his property were being changed from 2.0 to 6.82, resulting in a substantial fee increase.

Plantier objected.  In a July 2012 letter to the District, his counsel urged that the assignment of EDUs based upon building square footage was "arbitrary and discriminatory."  Counsel expressed the intention to "exhaust [Plantier's] administrative remedies before proceeding to Judicial Review."  In August 2012, Plantier met with the District's general manager and questioned the practice of assigning EDUs based upon square

---

[4] Ownership of the property is currently held by a family trust.

footage rather than actual water use. Plantier's objection was placed on the board of directors meeting agenda.

The board ultimately considered the matter in December 2012. A consumer advocacy group wrote to the board on Plantier's behalf urging that the EDU-based rate structure violates the proportionality requirement of Proposition 218, which specifies that a property-related fee or charge may not exceed the proportional cost of the service provided to the property. (Art. XIII D, § 6, subd. (b)(3).) Plantier and advocacy group representatives spoke at the meeting. The District denied each of Plantier's claims, including his objection to the EDU assignment method.

In November 2013, Plantier and two other commercial property owners[5] submitted an administrative claim with the District alleging that the EDU assignment method violates Proposition 218's proportionality requirement. The board rejected the claim.

C. *Procedural History*

Following the board's denial, Plantier and the two other commercial property owners (collectively, plaintiffs) sued the District in a putative class action. Plaintiffs allege the EDU assignment method violates Proposition 218 because the charge "is imposed without regard to the proportional cost of providing a property with wastewater service." They seek declaratory relief and a refund of unlawful charges. The trial court certified

---

[5] The other property owners are Progressive Properties Incorporated, which owns an office building, and Premium Development, LLC, which owns two different commercial entities.

a class consisting of District customers who paid a sewer charge on or after November 22, 2012.

The court bifurcated the bench trial. The first phase addressed the potentially dispositive issue of whether plaintiffs had exhausted their available administrative remedies before suing. The District conceded that the plaintiffs exhausted one remedy by submitting their November 2013 claim. The only remaining question was whether Proposition 218 imposes yet another exhaustion requirement that plaintiffs had not satisfied.

The trial court concluded that Proposition 218 created an additional unexhausted remedy. It relied in part upon *Wallich's Ranch Co. v. Kern County Citrus Pest Control Dist.* (2001) 87 Cal.App.4th 878 (*Wallich's Ranch*). The *Wallich's Ranch* court held that a party seeking to challenge an assessment under the Citrus Pest District Control Law (Food & Agr. Code, § 8401 et seq.; Pest Control Law) must first exhaust remedies by raising its challenge at the agency's annual budget hearing, thus allowing the agency to respond, formulate a resolution, and modify its budget if necessary. (*Wallich's Ranch,* at p. 885.) The court here reasoned that *Wallich's Ranch* applies because the Proposition 218 hearing procedure is inextricably intertwined with the District's annual budget process, which reviews costs and determines the need for revisions in fees. It noted that Proposition 218 requires the local agency to "consider all protests" (art. XIII D, § 6, subd. (a)(2)) at the public hearing required before fees are increased but that the agency obviously could not consider a protest that was never made.

It was undisputed that none of the representative plaintiffs participated in the Proposition 218 rate increase

hearings by either submitting a written protest or speaking at a hearing.[6] It was also undisputed that the District did not receive a single written or oral protest objecting to the EDU assignment method at the hearings conducted in 2012, 2013, and 2014.

Plaintiffs' counsel urged that any protest at these Proposition 218 hearings would have been futile. Counsel cited the District's repeated rejection of the EDU assignment challenge at various meetings and in response to plaintiffs' administrative claim. The trial court rejected the futility argument because District witnesses testified that any challenge to the EDU assignment method would have received careful consideration at the Proposition 218 hearings.

The Court of Appeal reversed, holding that plaintiffs' class action is not barred by their failure to participate in the hearings. The appellate court reasoned that a challenge to a fee on the ground it violates one of the substantive requirements of article XIII D, section 6, subdivision (b) exceeds the scope of a Proposition 218 hearing limited to protests over whether a proposed fee should be imposed or increased. (See art. XIII D, § 6, subd. (a).) Further, even if plaintiffs' challenge did come within the scope of a hearing, any remedy it afforded is inadequate. According to the appellate court, it is implausible that a majority of parcel owners would submit written protests under the circumstances presented here to trigger the majority

_____

[6] As used in this opinion, "participation" in a Proposition 218 hearing refers to either submitting a written protest or speaking at the hearing. Even under the District's view that a Proposition 218 hearing is an administrative remedy that must be exhausted, neither the District nor plaintiffs suggest that mere attendance at a hearing suffices as participation.

protest remedy of article XIII D, section 6, and invalidate a proposed fee or fee increase. Addressing Proposition 218's requirement that an agency " 'consider all protests' at the public meeting," the court stated that "merely having an agency consider a protest—without more—is insufficient to create a mandatory exhaustion requirement." The Court of Appeal concluded that *Wallich's Ranch* is distinguishable.

## II. DISCUSSION

We granted review to resolve whether a fee payor seeking to challenge an agency's method of calculating a property-related fee must first participate in a Proposition 218 public hearing at which the agency considers a proposed rate increase. Review is de novo. (See *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287; *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873.)

A. *Proposition 218*

Proposition 218, approved by voters in 1996, is one of a series of voter initiatives restricting the ability of state and local governments to impose taxes and fees. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258–260.) The first of these measures was Proposition 13, adopted in 1978, which limited ad valorem[7] property taxes to 1 percent of a property's assessed valuation and limited annual increases in valuation to 2 percent without a change in ownership. (*Jacks v. City of Santa Barbara*, at p. 258; art. XIII A, §§ 1, 2.) To prevent local governments

---

[7] "An ad valorem tax is a tax levied on property in proportion to its value, as determined by assessment or appraisal." (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1124.)

from increasing special taxes to offset restrictions on ad valorem property taxes, Proposition 13 prohibited counties, cities, and special districts from imposing special taxes without a two-thirds vote of the electorate. (*Jacks v. City of Santa Barbara,* at p. 258; art. XIII A, § 4.) But local governments were able to circumvent Proposition 13's limitations by relying on *Knox v. City of Orland* (1992) 4 Cal.4th 132, 141, which held a "special assessment" was not a "special tax" within the meaning of Proposition 13. (See *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 839.) Consequently, without voter approval, local governments were able to increase rates for services by labeling them fees, charges, or assessments rather than taxes. (*Ibid.*)

To address these and related concerns, voters approved Proposition 218, known as the "Right to Vote on Taxes Act," which added articles XIII C and XIII D to the California Constitution. (*Jacks v. City of Santa Barbara, supra,* 3 Cal.5th at p. 259.) Article XIII C concerns voter approval for many types of local taxes other than property taxes. Article XIII D addresses property-based taxes and fees.

Article XIII D allows only four types of local property taxes: (1) an ad valorem tax, (2) a special tax, (3) an assessment, and (4) a property-related fee. (Art. XIII D, § 3, subd. (a).) Proposition 218 supplements Proposition 13's limitations on ad valorem and special taxes by placing similar restrictions on assessments and property-related fees. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra,* 24 Cal.4th at p. 837.)

Article XIII D imposes distinct procedural and substantive limitations. (§§ 4, 6.) The *procedures* an agency must follow

before "imposing or increasing any fee or charge" are found in subdivision (a) of article XIII D, section 6.[8] An agency seeking to impose or increase a property-related fee must hold a hearing and send written notice of the hearing to the owner of each affected parcel. (Art. XIII D, § 6, subd. (a)(1).) The notice must specify the amount of the proposed fee, the basis of calculation, and the reason for the fee. It must note the date, time, and location of the public hearing. (*Ibid.*) At that hearing, "the agency shall *consider all protests* against the proposed fee or charge." (*Id.*, § 6, subd. (a)(2), italics added.) In addition to mandating that the agency "consider" all protests, Proposition 218 establishes a majority protest remedy. "If *written* protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge." (*Ibid.*, italics added.) Article XIII D does not define the term "protest" or explain what form a written protest must take.[9] Here, well over 3,000 written protests would have been required to reject a rate increase.

Even when an agency is generally authorized to impose or modify fees, so long as it complies with the notice and hearing

---

[8] Subdivision (c) of article XIII D, section 6 establishes a separate procedure applicable to certain property-related fees. That procedure does not apply to fees for sewer, water, and refuse collection services.

[9] The legislation implementing Proposition 218 does not provide any additional guidance concerning the required form or content of a written protest. (See Gov. Code, §§ 53750–53756.) However, that legislation does clarify that a written protest may be submitted by an *owner or tenant* of an identified parcel as long as only one protest per parcel is counted in determining whether the majority protest threshold is met. (Gov. Code, § 53755, subd. (b).)

requirements, Proposition 218 places other substantive limitations on the agency. Those *substantive* limitations on property-related fees appear in subdivision (b) of article XIII D, section 6. Under these limitations: (1) revenues derived from the fee may not exceed the cost of providing the property-related service (*id.*, § 6, subd. (b)(1)); (2) those revenues may not be used for any purpose other than the one for which the fee was imposed (*id.*, § 6, subd. (b)(2)); (3) *the amount of the fee "shall not exceed the proportional cost of the service attributable to the parcel"* (*id.*, § 6, subd. (b)(3), italics added); (4) a fee may not be imposed for a service unless that service is available to the property owner (*id.*, § 6, subd. (b)(4)); and (5) a fee may not be imposed upon property owners for a general governmental service, like fire protection, if the service is available to the general public in substantially the same manner as it is to property owners (*id.*, § 6, subd. (b)(5)).

Plaintiffs' complaint here turns on the substantive proportionality requirement of article XIII D, section 6, subdivision (b)(3), italicized above. The requirement "ensures that the aggregate fee collected on all parcels is distributed among those parcels in proportion to the cost of service for each parcel." (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 908.) The proportionality requirement concerns the *method* used to allocate a property-related service's aggregate cost among fee payors. It is separate from an agency's obligation not to collect more revenue than necessary to provide that service to all identified parcels. (See art. XIII D, § 6, subd. (b)(1).) Plaintiffs' complaint here is that the EDU assignment method does not properly allocate costs among parcels served.

B. *Exhaustion of Administrative Remedies*

Generally, "a party must exhaust administrative remedies before resorting to the courts. [Citations.] Under this rule, an administrative remedy is exhausted only upon 'termination of all available, nonduplicative administrative review procedures.'" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1080; see *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292–293.) "The rule 'is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts.'" (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321.)

The exhaustion doctrine is primarily grounded on policy concerns related to administrative autonomy and judicial efficiency. (See *Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 391.) The doctrine favors administrative autonomy by allowing an agency to reach a final decision without interference from the courts. (*Ibid.*) Unless circumstances warrant judicial involvement, allowing a court to intervene before an agency has fully resolved the matter would "constitute an interference with the jurisdiction of another tribunal." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1151.) If exhaustion were not required, a litigant would have an incentive to avoid securing an agency decision that might later be afforded deference. (See *Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 594.) Further, creating an agency with particular expertise to administer a specific legislative scheme would be frustrated if a litigant could bypass the agency in the hope of seeking a different decision in court.

As to judicial efficiency, the doctrine allows an administrative agency to provide relief without requiring resort to costly litigation. (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 501.) Even when an administrative remedy does not resolve all issues or provide complete relief, it still may reduce the scope of litigation. (See *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 476.) Requiring a party to pursue an available administrative remedy aids judicial review by allowing the agency to draw upon its expertise and develop a factual record for the court's consideration. (*Sierra Club v. San Joaquin Local Agency Formation Com.,* at p. 501.)

Here, the District claims a Proposition 218 rate hearing is an "administrative remedy" plaintiffs were required to exhaust. Before considering whether exhaustion is required under these particular circumstances, we pause to narrow the inquiry.

We need not here formulate a general definition that a procedure must satisfy to constitute an "administrative remedy." Such a question may vary among agencies and legislative schemes. For purposes of this analysis, we will assume that a Proposition 218 rate hearing is an "administrative remedy" because that is the way the parties and the courts below have framed the issue presented by this dispute. We do not decide the broader question of whether, when, and under what circumstances a public comment process may be considered an administrative remedy. We consider only

whether these Proposition 218 hearings were adequate to resolve plaintiffs' substantive challenge.[10]

Even when a procedure is considered an administrative remedy, a party may be excused from exhausting it if an exception applies. (*Campbell v. Regents of University of California, supra*, 35 Cal.4th at p. 322; see 1 Cal. Administrative Mandamus (Cont.Ed.Bar 2018) §§ 3.32–3.48, pp. 3-24 to 3-34.2 [listing exceptions].) One recognized exception arises if the remedy is inadequate to resolve a challenger's dispute. (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 342.)

As a general matter, a remedy is not adequate unless it "establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties." (*Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566.) *City of Coachella v. Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1287 held that a public hearing process did not provide an adequate remedy because the agency was not required to "*do* anything in response to submissions or testimony received by it incident to those hearings." Similarly, in *City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 237, a public hearing process without "clearly defined procedures" for the conduct of the hearing and "no standards for decisionmaking" was determined to be inadequate as a remedy.

---

[10] This narrow analytical approach is driven in part by the unique procedure set forth in Proposition 218. It should not be interpreted to suggest that every public meeting at which a local government adopts legislation constitutes an "administrative remedy."

The primary procedural remedy afforded by article XIII D, section 6, subdivision (a) is that a *majority* of fee payors may reject a new or increased fee by submitting written protests. (Art. XIII D, § 6, subd. (a)(2).) But a single written protest would seldom, if ever, determine whether a proposed fee would be rejected. That is particularly true here, where thousands of individual property owners would have to protest in writing to meet the rejection threshold.

Further, the District only gave notice that it sought to raise the rate for all parcels serviced. It gave no notice that it was proposing to change the EDU assignment method. Accordingly, whatever the result of the public hearings on *rates*, the board essentially would have been without authority to modify the *assignment method*.

This is so because a change to the method for calculating a fee is considered an increase in the fee for purposes of Proposition 218 if it results in an increased amount being levied on *any* person or parcel. (Gov. Code, § 53750, subd. (h)(1)(B).) A methodological change in the allocation of costs among fee payors will almost always result in some parcels paying a higher fee to offset those that will now be required to pay less. If, instead of rejecting plaintiffs' challenge, the agency determined it should change its EDU assignment method, it would have had to give notice of an intended change as Proposition 218 requires. The notice here, informing fee payors of a proposed *rate* increase, would not permit the agency to tinker with the *method* for calculating the fee, because a fee increase on certain fee payors resulting from a methodological change would be beyond the scope of the notice.

Here, plaintiffs objected to the sewer charge by urging that the EDU assignment method itself violates Proposition 218's proportionality requirement. They fully adjudicated their challenge using the District's own administrative procedures. They now seek judicial intervention to challenge the District's rejection of their request for a change. The noticed Proposition 218 hearings did not offer them the possibility of any effective relief. If a majority of property owners had rejected a proposed fee increase, the District would lose the authority to adopt the *increase.* The existing charge would have remained in place, with the same rate structure, and plaintiffs' proportionality objection would have remained unresolved.

Even in the absence of a majority protest, the agency is still required to "consider all protests against the proposed fee or charge" at the public hearing. (Art. XIII D, § 6, subd. (a)(2).) There is some dispute over whether "consider[ing]" all protests is a requirement separate from the majority protest procedure. Plaintiffs and amicus curiae Howard Jarvis Taxpayers Association urge that "consider" in this context simply means to count all written protests to see if a majority is achieved. That contention is unpersuasive. Article XIII D, section 6, subdivision (a)(2) provides that an agency may not impose a fee if a majority of owners present written protests. It follows that an agency must count all qualified protest votes it is required to receive. Further, although an agency is required to count all *written* protests, it must "consider" *all* protests at the hearing, even those not reduced to writing. (*Ibid.*) Thus, to "consider" all protests must mean more than simply counting the number of written protests. To interpret "consider all protests" as simply a vote-counting requirement would render that language redundant. Interpretations that render statutory language

meaningless are to be avoided. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1010.)

To "consider" means to "think about carefully" or to "take into account." (Webster's 9th New Collegiate Dict. (1987) pp. 279–280.) The requirement to "consider all protests" (art. XIII D, § 6, subd. (a)(2)) at a Proposition 218 hearing compels an agency to not only receive written protests and hear oral ones, but to take all protests into account when deciding whether to approve the proposed fee, even if the written protesters do not constitute a majority. The question remains whether requiring an agency to "consider all protests" (*ibid.*) at a public hearing, without more, constitutes an adequate administrative remedy under the circumstances presented here.

While Proposition 218 arguably provides a framework to hear relevant challenges (see art. XIII D, § 6, subd. (a)(2)), a fee payor has little control over when or even if its complaints may be heard. Here, it was purely coincidental that the District held Proposition 218 rate increase hearings around the same time plaintiffs pursued a proportionality challenge to the existing fee structure. The District did so because of the conclusion it needed to increase its fees to cover costs. If the District had chosen to delay increasing its rates, there would have been no need for a Proposition 218 hearing. Alternatively, the District could have dispensed with a Proposition 218 hearing if it limited any fee increases to an adjustment for inflation in compliance with Government Code section 53756. In either case, plaintiffs would have had no opportunity to have their methodology challenge heard at a Proposition 218 hearing until the District ultimately decided to make such a change and notice a hearing to consider it.

Proposition 218 also provides a limited opportunity for an agency to evaluate protests. The requirement that a local government "consider all protests" is restricted to considering protests "[a]t the public hearing." (Art. XIII D, § 6, subd. (a)(2).) While an agency may continue a hearing to allow additional time for consideration (see Gov. Code, § 53753, subd. (d)), nothing compels the agency to do so. Further, nothing in Proposition 218 or the legislation implementing it defines what level of consideration must be given. A hearing convened to consider protests to a proposed rate increase will generally be a poor forum for evaluation of an established method for allocating fees. That is particularly true when an objection to the method is first raised at the hearing itself.

We note that plaintiffs' complaint challenges the *existing* structure for allocating fees, not any *proposed* new fee or increased rate. The purpose of the notice and hearing procedures in article XIII D, section 6, subdivision (a) is to provide property owners an opportunity to protest the "*proposed* fee or charge." (Art. XIII D, § 6, subd. (a)(1) & (2), italics added.) By contrast, the substantive requirements in section 6, subdivision (b) govern *existing* as well as proposed fees. Section 6, subdivision (b) provides that an existing fee may not be "extended" without complying with substantive requirements. Thus, a Proposition 218 rate increase hearing is not a forum to protest an existing rate structure that will remain unchanged by the proposal. The District suggests otherwise, arguing that the method for allocating fees is necessarily at issue in a Proposition 218 rate increase hearing because that method will effectively be reenacted when the proposed rate increase is adopted. That argument misses the mark. In a hearing called only to consider a rate increase, the existing allocation method

will be reenacted regardless of whether the rate increase is adopted or rejected. Therefore, the District cannot legitimately claim the method for calculating the fee is part of what is being newly "proposed," and thus subject to protest, because that method will remain unchanged no matter the outcome of the hearing.

Fundamentally, the Proposition 218 hearings held by the District were inadequate because they did not allow the District to resolve plaintiffs' particular dispute. Even if the District had considered the substance of plaintiffs' proportionality objection and concluded it had merit, the District would not have been able to address the matter in the context of the pending Proposition 218 hearing. As the District acknowledges, if a valid methodological challenge were raised, the most an agency could do is formulate a new fee proposal to resolve the challenge and initiate a Proposition 218 hearing to consider *that* proposal. It would be oddly burdensome to require an aggrieved party to participate in a Proposition 218 hearing simply to raise an objection that could only be addressed meaningfully in a separate public hearing that is subject to its own notice requirements. Further, an aggrieved party has no power to compel an agency to conduct a public hearing to change the method for imposing a fee. Because nothing requires the agency to initiate a new Proposition 218 hearing, there is no guarantee a challenge would be addressed even if valid.

The District argues that "consideration" necessarily entails resolving any protests, presumably because objections are impliedly either accepted or rejected when an agency's board ultimately votes on a proposed fee. The contention fails. Adoption of a proposed fee increase does not resolve a proportionality challenge to a fee's calculation because the

agency is not empowered to change the method by which a fee is calculated when considering whether to increase a preexisting fee. An agency's ultimate decision to adopt or reject a proposed rate increase cannot be interpreted as a resolution of all issues presented to it.

The District falls back on the principle that exhaustion of remedies is required even if an administrative remedy does not dispose of the entire dispute or afford the precise relief sought. (See *Sierra Club v. San Joaquin Local Agency Formation Com., supra,* 21 Cal.4th at p. 501.) When a party challenges the method used to calculate a fee, a Proposition 218 hearing limited to a proposed fee increase does not simply offer incomplete relief, it offers no relief at all. Moreover, the purpose for applying the exhaustion rule even when complete relief is unavailable is that exhaustion of remedies serves to ensure administrative autonomy and promote judicial efficiency. (*Sierra Club v. San Joaquin Local Agency Formation Com*, at p. 501.) But the purposes of the exhaustion rule are not served by the public hearing here. That process does not narrow the scope of the claims and relieve the burden on the courts. It does not promote the development of a factual record for review. And, it does not give the administrative agency a meaningful opportunity to apply its expertise because the agency will typically have no power to modify a proposed fee to address a valid methodological challenge.

For the reasons discussed above, a party may challenge the method used to calculate a fee without first having participated in a Proposition 218 hearing called to consider a rate increase. Such a hearing does not provide an adequate remedy for a methodological challenge. We do not decide and express no view on the broader question of whether a

Proposition 218 hearing could ever be considered an administrative remedy that must be exhausted before challenging the substantive propriety of a fee in court.

Along with various amici curiae, the District contends that allowing a party to sue without having first participated in the Proposition 218 hearing process renders that process and the duty to consider all protests meaningless. That is not so. This hearing process did what it is intended to do: give a majority of fee payors the chance to veto a rate increase and ensure the decisionmakers are aware of public opposition. It would be a meaningless exercise, however, to require a party to raise a methodological challenge at a hearing where the agency has no obligation to respond and cannot resolve the challenge.

As a final matter, it is necessary to address the import of *Wallich's Ranch, supra,* 87 Cal.App.4th 878, the decision relied upon by the trial court and distinguished by the Court of Appeal. The District cites *Wallich's Ranch* for the principle that a "remedy exists if the law provides for notice, opportunity to protest and a hearing." *Wallich's Ranch* does not stand for such a broad proposition. But even if it could be interpreted to describe a public comment procedure as a "remedy," it does not establish that the mere opportunity to comment at a public hearing constitutes an *adequate* remedy.

In *Wallich's Ranch,* the plaintiff brought an action against various agencies seeking a refund of assessments imposed under the Pest Control Law. (*Wallich's Ranch, supra,* 87 Cal.App.4th at p. 880.) Although the plaintiff raised a claim that the assessments violated Proposition 218, the trial court concluded the assessments were not governed by its provisions. (*Id.* at p. 882.) On appeal, the issue was limited to whether the plaintiff

had exhausted available remedies *under the Pest Control Law*. (*Id*. at pp. 883–885.) The appellate court concluded the plaintiff was required to exhaust administrative remedies by participating in the public hearing process associated with the adoption of the agency's annual budget. (*Id*. at p. 885.) The court in *Wallich's Ranch* had no occasion to consider whether Proposition 218 imposes a separate exhaustion requirement.[11]

Although the public hearing in *Wallich's Ranch* had some similarities to the Proposition 218 process, the decision is distinguishable.[12] Under the Pest Control Law, an agency must adopt a preliminary fiscal year budget and hold a public hearing on that budget. (Food & Agr. Code, §§ 8559–8561.) Any owner of citrus acreage subject to an assessment may protest in writing. (*Id*., § 8564.) At the hearing, the agency must "hear *and pass upon* all protests so made and its decision shall be final and conclusive." (*Id*., § 8565, italics added.) The Pest Control Law gives the agency the authority to "make such changes in the proposed budget as it finds are proper and advisable." (*Id*., § 8566.)

---

[11] In distinguishing *Wallich's Ranch,* the Court of Appeal noted that the plaintiffs here had exhausted the remedy afforded by the District's own legislative code. By contrast, the plaintiff in *Wallich's Ranch* had not attempted to exhaust *any* available administrative remedy. To be clear, our decision does not turn on plaintiffs' exhaustion of administrative remedies set forth in the District's legislative code. A party must exhaust all available nonduplicative remedies. (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd., supra,* 35 Cal.4th at 1080.)

[12] The propriety of the holding in *Wallich's Ranch* is not before us. We express no view on whether it was correctly decided.

The Pest Control Law not only requires the agency to rule upon any protests, it also gives the agency the authority to adjust its budget and make any necessary changes in response to protests. (*Wallich's Ranch, supra,* 87 Cal.App.4th at p. 885.) By contrast, an agency seeking to increase the rate at a Proposition 218 hearing has no authority to resolve methodological challenges or to modify the fee structure.

In addition, the Pest Control Law affords a property owner an opportunity to be heard at least once a year, when an agency adopts its fiscal year budget. (Food & Agr. Code, § 8560.) Proposition 218 offers no guarantee a fee payor like Plantier will be given an opportunity to be heard in that forum. It was purely serendipitous that plaintiffs brought their proportionality challenge around the same time the District held Proposition 218 hearings to consider increasing its rates.

Plaintiffs here seek judicial review of their claim that the method used to allocate fees among parcels violates a substantive limitation imposed by the state Constitution. It would serve no purpose and make little sense to require that, in order to do so, they must participate in a hearing convened to consider a different question and at which they could not secure relief.

Under appropriate circumstances, the exhaustion doctrine appropriately provides a defensive shield for administrative agencies to insulate their actions from judicial intervention until a challenger gives the agency an opportunity to resolve the dispute in the first instance. Here, however, the District seeks to strike down claims not properly encompassed in the Proposition 218 rate increase hearings. In effect, it seeks to use

the exhaustion doctrine as a sword rather than a shield.  That it cannot do.

## III.  DISPOSITION

The judgment of the Court of Appeal is affirmed.


**CORRIGAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Plantier v. Ramona Municipal Water District

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 12 Cal.App.5th 856
**Rehearing Granted**

_____

**Opinion No.** S243360
**Date Filed:** May 30, 2019

_____

**Court:** Superior
**County:** San Diego
**Judge:** Timothy B. Taylor

_____

**Counsel:**

Patterson Law Group, James R. Patterson, Allison H. Goddard, Catherine S. Wicker; Carlson Lynch Sweet Kilpela & Carpenter and Todd D. Carpenter for Plaintiffs and Appellants.

Trevor A. Grimm, Jonathan M. Coupal, Timothy A. Bittle and Laura E. Murray for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall, Gregory V. Moser, John D. Alessio and Adriana R. Ochoa for Defendant and Respondent.

Daniel S. Hentschke; Colantuono, Highsmith & Whatley, Michael G. Colantuono and Eduardo Jansen for League of California Cities, California State Association of Counties, California Association of Sanitation Agencies, California Special Districts Association and Association of California Water Agencies as Amici Curiae on behalf of Defendant and Respondent.

Mary R. Casey; Bertrand, Fox, Elliot, Osman & Wenzel and Thomas F. Bertrand for Main Municipal Water District as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Allison H. Goddard
Patterson Law Group
1350 Columbia Street, Suite 603
San Diego, CA  92101
(619) 756-6990

Laura E. Murray
Howard Jarvis Taxpayers Foundation
921 Eleventh Street, Suite 1201
Sacramento, CA  95814
(916) 444-9950

Kendra J. Hall
Procopio, Cory, Hargreaves & Savitch
525 B Street, Suite 2200
San Diego, CA  92101
(619) 238-1900